132 T.C. No. 12

UNITED STATES TAX COURT

SANTA FE PACIFIC GOLD COMPANY AND SUBSIDIARIES, BY AND THROUGH
ITS SUCCESSOR IN INTEREST NEWMONT USA LIMITED, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22956-06.                    Filed April 27, 2009.

        SF was a wholly owned subsidiary of parent P.  P spun
SF off into a stand-alone entity.  Two years after being
spun off, SF faced a hostile takeover by competitor N.  In
order to avoid being taken over, SF entered into a merger
agreement with white knight HS.  The merger agreement
provided for the payment of a termination fee should the
agreement be terminated.  Shortly thereafter N increased its
offer.  SF's board accepted the increased offer.  SF paid a
$65 million termination fee to HS.  SF claimed a deduction
for the amount of the termination fee on its 1997 tax
return, which R disallowed.

        Held:  SF is entitled to a deduction of $65 million for
the termination fee.

David D. Aughtry, Arnold B. Sidman, and William O. Grimsinger, for petitioner.

Curt M. Rubin, Matthew I. Root, Michael D. Wilder, and Jennifer S. McGinty, for respondent.

Contents

FINDINGS OF FACT.........................................3

    A.  Introduction....................................4
    B.  Spin-off of Mining Unit.........................5
    C.  The Mining Industry in General..................5
    D.  Santa Fe's First 2 Years........................6
        1.  Initial Corporate Strategy..................8
        2.  Becoming Poolable...........................8
    E.  Initial Contacts................................9
    F.  Initial Contact With Newmont and Homestake......10
    G.  November 21, 1996, Santa Fe Board Meeting.......17
    H.  Newmont Responds to Santa Fe's Rejection.......18
    I.  December 8, 1996, Santa Fe Board Meeting........19
    J.  Newmont Reacts to the Santa Fe-Homestake Agreement
       .............................................22
    K.  Santa Fe Reacts to Newmont's Increased Offer....25
    L.  The March 7-8, 1997, Santa Fe Board Meeting.....29
        1.  Newmont Offer..............................29
        2.  Homestake Offer............................29
            a.  Initial Homestake Offer.............29
            b.  Attempts To Obtain a Higher Offer.. 30
        3.  Newmont Wins Out...........................30
    M.  The Santa Fe-Newmont Agreement..................30
    N.  Santa Fe Post Merger............................31

OPINION.................................................33

I.   Burden of Proof......................................33

II.  Deductibility v. Capitalization.....................33

    A.  INDOPCO, Inc. v. Commissioner...................36
    B.  Victory Mkts., Inc. & Subs. v. Commissioner.....37
    C.  United States v. Federated Dept. Stores, Inc...37
    D.  Staley I & II...................................38

III. Origin of the Claim Doctrine........................39

IV.   Petitioner's Arguments...............................41

          A.   Significant Benefit.......................41
          B.   Origin of Claim..........................41
          C.   Petitioner's Experts.....................43

V.    Respondent's Arguments..............................44

          A.   Significant Benefit.......................44
          B.   Origin of Claim..........................46
          C.   Respondent's Expert......................49

VI.   Analysis............................................49

VII.  Conclusion..........................................58

VIII. Section 165.........................................58

IX.   Conclusion..........................................62

GOEKE, Judge:  The issue for decision is whether Santa Fe Pacific Gold Co. (Santa Fe) is entitled to a deduction of $65 million for a payment made to Homestake Mining Co. (Homestake) as a result of the termination of a merger agreement between Santa Fe and Homestake (termination fee) for Santa Fe's 1997 tax year. For the reasons stated herein, we find that Santa Fe is entitled to a deduction pursuant to sections 162 and 165.[1]

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts and accompanying exhibits are incorporated herein by this reference.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner's principal office and place of business was Denver, Colorado, on the date it filed its petition.

A.  Introduction

During the late 1800s the Federal Government hoped to spur development of cross-country railroads.  In order to entice private companies to develop those railroads, the Federal Government offered and granted large parcels of land bordering the railroads to the companies that developed them.  The program was successful, and as a result a checkerboard pattern of land owned by the railroads spread across the country.

Santa Fe Pacific Corp. was one company that took part in the Government program, worked to build transcontinental railroads, and was granted land alongside its rails.  Some of this land contained minerals that could be mined for profit.  Santa Fe Pacific Corp. took no part in the mining of its land.  Until the late 1970s Santa Fe Pacific Corp. leased these mineral rights to unrelated companies and individuals rather than mine the land itself.

Santa Fe Industries, successor to Santa Fe Pacific Corp., later developed an internal unit to manage the mining of the parcels of land.  The mining unit originally focused on uranium mining but later switched to coal and then gold mining.

B. <u>Spinoff of the Mining Unit</u>

In the late 1980s Santa Fe Industries became the target of a hostile takeover attempt. In a move meant to help defeat the attempted acquisition, the mining unit was put up for sale. Although the sale was never consummated, the mining unit's management realized that they were not considered an integral part of Santa Fe Industries and began to appreciate the benefits of the mining unit's being a stand-alone entity. Management of the mining unit began to consider the idea of having it separated from the parent company.

The spinoff of Santa Fe was a two-step process. First, there was an initial public offering (IPO) of 14.6 percent of Santa Fe's common stock on June 23, 1994. In September 1994 Santa Fe's parent corporation distributed its remaining shares of Santa Fe stock to Santa Fe's public shareholders. As a result of the spinoff, Santa Fe became a publicly traded stand-alone entity.

Once the spinoff was completed, the newly independent company's management appreciated the benefits of being a stand-alone company and did not want to return to being a subsidiary of a larger company.

C. <u>The Mining Industry in General</u>

Mining companies are classified by tiers. First-tier mining companies are the top mining companies in the country. Newmont

USA Limited (Newmont) was a first-tier mining company. Second-tier mining companies are smaller mines focused on developing mines and building production. Santa Fe and Homestake were second-tier mining companies. Third-tier mining companies are the lowest ranked and consist of junior exploration companies.

During the 1990s the mining industry was in a state of consolidation. Consolidation was driven by two factors: (1) Larger companies could lower costs; and (2) larger companies were viewed as better investments because they had higher multiples on earnings and cashflow than smaller companies. Second-tier mining companies traded at lower multiples than first-tier companies.

D. Santa Fe's First 2 Years

Because Santa Fe could not qualify for "pooling of interests" accounting treatment,[2] Santa Fe was an unattractive company to other mining companies. Pooling of interests accounting is preferred because it avoids the creation of goodwill. If a transaction qualifies for pooling of interests accounting treatment, the purchaser will generally pick up the target's assets, liabilities, and net worth at the book values those items had on the target's financial statements, without regard to the current fair value of those assets or liabilities,

---

[2]Pursuant to the Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 141, Business Combinations, pooling of interests accounting is no longer available to transactions initiated after June 30, 2001.

or the fair value of the consideration the purchaser issued in exchange for the target's net assets. See 3 Ginsburg & Levin, Mergers, Acquisitions, and Buyouts, par. 1703.4. If a transaction does not qualify for pooling of interests accounting treatment, purchase accounting rules apply. Goodwill may be created when purchase accounting rules apply. This purchase goodwill, considered a new asset, is shown on the acquirer's books as the excess of the acquirer's cost for the target over the fair market value of the target's identifiable assets. Id. par. 1703.2.1. Creation of goodwill is undesirable from the acquirer's standpoint because the goodwill might have to be written off. Id. Goodwill is required to be written off to the extent it becomes impaired. Id. Goodwill is impaired when "'the carrying amount of goodwill exceeds its implied fair value.'" Id. par. 1703.2.1.3 (quoting FASB Statement No. 142, par. 18). The determination of impairment, if any, is made on a case-by-case basis pursuant to accounting rules. Id. par. 1703.2.1.3. A company considering an acquisition would prefer pooling of interests accounting, thereby avoiding the effects of purchase accounting.

Pooling of interests accounting treatment was prohibited with respect to acquisitions of a company within 2 years of the time that the company was a subsidiary of another company. Accordingly, for 2 years Santa Fe would not be able to take

advantage of pooling of interests accounting treatment for any business combination it took part in. Pooling of interests accounting treatment would be available if Santa Fe were to enter into a transaction that would otherwise qualify for pooling of interests accounting treatment after October 1, 1996.

### 1. Initial Corporate Strategy

On January 1, 1995, Santa Fe's president, Pat James (Mr. James), took over as chief executive officer and chairman of Santa Fe's board of directors. Santa Fe management had set as one of its goals reaching first-tier status. In order to do so, management set an initial production goal of 1 million troy ounces of gold per year and hoped to reach that goal by 1997. Santa Fe reached this goal by the end of 1996. Management also developed a 5-year business plan that was later expanded to a 10-year business plan. Once Santa Fe had accomplished its goal of 1 million troy ounces per year, the company planned on increasing production to 2 million troy ounces per year.

### 2. Becoming Poolable

Towards the end of 1995 Santa Fe began to investigate possible three-way combinations with TVX Gold, Inc. (TVX), and Battle Mountain Gold Co. (Battle Mountain). Both TVX and Battle Mountain were significant companies in the mining industry but were smaller than Santa Fe. At this time Santa Fe's management recognized the value of its large land positions and understood

that this made the company a prime takeover target. The impossibility of qualifying for pooling of interests accounting treatment, however, protected Santa Fe from takeover because the prospect of being forced to account for the transaction under purchase accounting rules made Santa Fe a less attractive target. Recognizing that the prohibition against pooling was going to end soon, however, Santa Fe realized that it would need a new strategy to avoid takeover. Santa Fe viewed a possible three-way merger as a defense against a possible hostile takeover. However, the prospective deals with TVX and Battle Mountain were unsuccessful.

E. Initial Contacts

On January 19, 1996, Santa Fe's board of directors (the Santa Fe board) engaged S.G. Warburg & Co., Inc. (S.G. Warburg), as the board's financial advisers. The engagement letter indicated that S.G. Warburg would act as strategic financial advisers to Santa Fe, advising the company regarding acquisitions, mergers of equals, and takeover defenses. Santa Fe's management was interested in exploring possible acquisitions by Santa Fe and was targeting companies both smaller than and equal in size to Santa Fe. Management's strategy was that acquisitions would help to defeat a takeover attempt because any acquisition would increase Santa Fe's value, requiring a suitor to pay a higher price.

F.  Initial Contact With Newmont and Homestake

On April 1, 1996, at a meeting of the Gold Institute, a mining industry association, Ron Cambre (Mr. Cambre), chief executive officer of Newmont, contacted Mr. James about a business combination.  Mr. James was not surprised.  Newmont was two to three times larger than Santa Fe and was one of the biggest companies in the mining industry.  Mr. Cambre did not provide a specific proposal but informally mentioned that Newmont and Santa Fe should be looking at some sort of combination of the two companies.  Newmont's interest in a combination with Santa Fe centered on Santa Fe's land position.  At that time Santa Fe had a larger land position in Nevada than Newmont did.  Mr. James viewed any hypothetical business combination with Newmont as a takeover of Santa Fe because of their relative sizes.  Mr. James rebuffed Mr. Cambre's attempts, informing Mr. Cambre that Santa Fe wanted to continue as an independent firm.

At that time Santa Fe's management realized that it had to act before the 2-year prohibition on pooling of interests accounting expired in order for Santa Fe's business and long-term plans to be protected.  On July 17, 1996, Mr. Cambre wrote to Mr. James reiterating his desire to explore a possible business combination of Newmont and Santa Fe.

At a July 25, 1996, meeting of the Santa Fe board, Mr. James discussed Santa Fe's strategic alternatives.  S.G. Warburg

provided a more detailed review of these options, while counsel from the law firm of Skadden, Arps, Slate, Meagher & Flom made a presentation on the Santa Fe board members' fiduciary duties in considering any strategic alternatives.

On July 26, 1996, the Homestake board of directors (the Homestake board) met. The minutes of that meeting reflected that during the meeting Homestake's president and chief executive officer Jack Thompson (Mr. Thompson) informed the Homestake board that he had recently spoken with Mr. James regarding Santa Fe's interest in a possible business combination with Homestake. The minutes further indicated that Mr. James told Mr. Thompson that Santa Fe "would prefer to act on its own at this point".

Sometime around the beginning of August 1996 Mr. James informed Mr. Cambre that Santa Fe was not interested in pursuing a combination with Newmont. On August 8, 1996, Mr. Cambre sent a letter to Mr. James expressing his disappointment that Santa Fe had decided to stay the course and not consider a business combination with Newmont. The letter also stated that with Santa Fe's nonpooling period coming to a close, Mr. Cambre knew that Santa Fe and Santa Fe's board would "be concerned about hostile interlopers" who would disrupt Santa Fe's strategic plans, and that a combination with Newmont would protect Newmont's and Santa Fe's ability to work towards their strategic goals.

Mr. James and Mr. Batchelder, a Santa Fe director, did not view Mr. Cambre's letter as a positive development. Rather, they viewed Mr. Cambre's letter as a warning that Santa Fe was vulnerable to a takeover. Mr. James and Mr. Batchelder viewed Newmont as one of the companies that could take Santa Fe over if Santa Fe resisted their friendly overtures. Mr. Batchelder had experience dealing with mergers and acquisitions and hostile takeovers in the mining industry before joining Santa Fe as a director. On August 22, 1996, Mr. James responded to Mr. Cambre's August 8, 1996, letter and reiterated Santa Fe's position that it was not interested in a business combination with Newmont at that time.

On September 18, 1996, the Newmont board of directors (the Newmont board) met. Before the meeting, Mr. Cambre sent the board members a letter detailing his beliefs that Santa Fe was a good strategic fit and that Newmont should pursue a transaction with Santa Fe. It also detailed Mr. Cambre's discussions with Mr. James and passed along Mr. James's message of August 22, 1996, that Santa Fe was not interested in a transaction with Newmont. Attached to the letter was a presentation prepared by Goldman, Sachs & Co. (Goldman Sachs) about Project North.[3] The

---

[3]Parties to merger or acquisition transactions often refer to themselves and other entities involved with code words that begin with the same letter as the name of the entity. Newmont was referred to as "North", while Santa Fe was referred to as

(continued...)

presentation listed the positive and negative aspects of doing either a friendly or hostile deal with Santa Fe.  Specifically listed as a potential negative consequence of an unfriendly deal was that a negative attempt might "drive South into the hands of another party".  The presentation also included steps North could take to "turn up the heat" on South and a review of South's structural defenses.  The presentation included a slide which showed the following:

> Turning up the Heat
> Levels of Unsolicited/Hostile Activity
>
> 1.   Target CEO Private Conversation
> 2.   Target Board Member Private Conversation
> 3.   Target CEO Private Letter
> 4.   [Acquire Stock Secretly (<5%)]
> 5.   Target Board Member "On the Record" Conversation
> 6.   Non-disclosable Bear-Hug Letter
> 7.   Public Expression of Interest
> 8.   Disclosed Bear-Hug Letter
> 9.   [Acquire Stock Publicly (>5% or announce)]
> 10.   Proxy Fight/Special Meeting/Written Consent
> 11.   Public Tender/Exchange Offer

The steps are ordered in increasing levels of hostility. Steps 1 through 4 were considered private because they would not trigger any duty of Santa Fe management or the Santa Fe board that would require management or the board to announce to Santa Fe's shareholders and the public at large that Santa Fe and Newmont were in discussions.  For example, should a Newmont board member contact a Santa Fe board member, as described in step 3,

---

the contact could be structured such that the Santa Fe board was not required to inform Santa Fe's shareholders. Likewise, step 6 would be a letter to Santa Fe's management and board from Newmont that would not trigger a duty of disclosure to shareholders. Step 8, however, would be a public letter that would alert Santa Fe's shareholders and the public to Newmont's interests. Steps 9 through 11 would be a clear, public, hostile takeover of Santa Fe by Newmont.

In the months leading up to Santa Fe's becoming poolable, Santa Fe's management began to consider its strategic options. At that time Homestake was unable to discuss any combinations with Santa Fe because Homestake was dealing with a regulatory issue, and Battle Mountain was currently engaged in finishing a prior acquisition; this left Newmont. The Santa Fe board recognized that if they did not reach out to Newmont first, Newmont was sure to reach out to them. The board and the management felt that by initiating contact they would be able to maintain control over any due diligence or meetings between Santa Fe and Newmont personnel. Also, meeting with Newmont in a friendly manner might allow Santa Fe to learn more about Newmont's thought processes and goals.

On September 26, 1996, the Santa Fe board met again and instructed Mr. James and Mr. Batchelder to approach Newmont concerning possible strategic plans. At the time, Santa Fe

management was afraid of having the company put in play because that would effectively mean the company was for sale to the highest bidder. Mr. James hoped that if Santa Fe was able to remain in control during the process, it might be able to delay Newmont long enough to allow Homestake to become available. Santa Fe viewed Homestake as a possible "white knight" and hoped that an agreement with Homestake would prevent Newmont from acquiring Santa Fe. Also, an agreement and merger with Homestake would provide benefits to Santa Fe that its management viewed as absent in any merger with Newmont, including in part: (1) Shared board control; (2) shared management; (3) greater retention of Santa Fe employees; and (4) an opportunity to continue Santa Fe's business objectives.

Mr. James felt that a merger with Homestake would be much better for Santa Fe because he viewed it as an opportunity to merge two undervalued companies. The merger would also result in more Santa Fe employees keeping their jobs as a result of a fairer selection process.

Santa Fe management recommended to the Santa Fe board that the board talk to Newmont but leave their options open in case Homestake became available. Mr. James and Mr. Batchelder met with Mr. Cambre on October 1, 1996, at Mr. Cambre's home in New Mexico. Also present was Wayne Murdy (Mr. Murdy), who was serving as Newmont's chief financial officer at the time.

About 6 weeks later, Santa Fe and Newmont held what appeared to Newmont to be initial due diligence meetings. During these meetings Mr. James came to realize further that a deal with Newmont would not be in the best interests of Santa Fe and its shareholders because it appeared to him that many Santa Fe employees would be fired and the work Santa Fe's management had done to develop the company would be lost.

While these meetings were ongoing, Santa Fe attempted to get Newmont to enter into a standstill agreement.[4] A standstill agreement would have prevented Newmont from launching a hostile bid for Santa Fe if Santa Fe and Newmont were unable to come to an agreement. Newmont refused to enter into a standstill agreement for just this reason; it specifically wanted to reserve its right to launch a hostile bid and go directly to the Santa Fe shareholders if that was what was necessary to get a deal done. Mr. James understood Newmont's refusal of a standstill provision to be an indicator of Newmont's reserving its right to begin a hostile takeover.

Shortly thereafter Mr. James learned that Homestake's regulatory issue had been resolved. Mr. James called Mr. Thompson and set up a lunch in the hope of convincing Homestake

---

[4]A standstill agreement is defined as "Any agreement to refrain from taking further action; esp., an agreement by which a party agrees to refrain from further attempts to take over a corporation (as by making no tender offer) for a specified period". Blacks Law Dictionary (8th ed. 2004).

to enter into a merger with Santa Fe. Santa Fe's management hoped that a combination with Homestake would derail Newmont's acquisition attempt. On November 6, 1996, Mr. Thompson sent a letter to Mr. James indicating his belief that a merger between Santa Fe and Homestake would be good for their investors. The letter further stated that Mr. Thompson was prepared to recommend to the Homestake board that Homestake and Santa Fe merge on the basis of a "'pooling of interests,' combining our management and shareholders as partners."

Mr. James and Mr. Thompson met shortly thereafter. Mr. Thompson was interested in quickly pursuing due diligence, which began the following week. Santa Fe and Homestake moved quickly to investigate a possible merger.

G. November 21, 1996, Santa Fe Board Meeting

On November 21, 1996, Newmont submitted its offer to the Santa Fe board. The next day Homestake submitted its offer. At the time both Homestake and Newmont had suspicions that other parties were involved in negotiations with Santa Fe, but neither knew for sure nor knew the identities of any other possible bidders.

Santa Fe's management recommended the Santa Fe-Homestake deal to the Santa Fe board. The Santa Fe board discussed the pending offers and chose to proceed with Homestake. Mr. James and Mr. Batchelder called Mr. Cambre to inform him that Newmont's

offer had been rejected. Mr. James did not ask for a higher offer nor tell Mr. Cambre about Santa Fe's and Homestake's agreement when the two spoke. After that call ended, Mr. Cambre spoke with Mr. Murdy and expressed his displeasure at being rejected and not having a chance to discuss a higher offer. The two also came to the conclusion that Newmont would have to, in Mr. Murdy's words, "turn up the heat" on Santa Fe.

H. Newmont Responds to Santa Fe's Rejection

The Santa Fe board met on December 5, 1996. Along with its normal duties the Santa Fe board discussed the pending Santa Fe-Homestake merger. During the meeting Newmont sent a fax to Santa Fe's offices. The fax stated that at 10 a.m. that morning Newmont was going to issue a press release detailing the offer that Newmont had submitted and Santa Fe had rejected. The press release provided details on the offer.[5] The offer described in the press release, although similar to the previous offer, was not identical. Because the offer contained in the press release was so similar to Newmont's earlier offer, the Santa Fe board did not feel that it triggered any fiduciary duty to investigate and consider the offer any more than they had already. Accordingly, the Santa Fe board was able to, and did, reject it outright.

---

[5]This is a type of public bear hug letter, as described in step 8 of the Goldman Sachs presentation discussed supra.

Mr. James and the other members of Santa Fe's management and board viewed this press release sent directly to its shareholders as a hostile tactic. Newmont had not increased its offer, did not take into account whether there were any third parties involved, and did not make any attempt, until 15 minutes before the press release was issued, to contact Santa Fe about the press release. Newmont could have kept the offer private, rather than issue it publicly. Had it been kept private, Santa Fe's management and board would have had the option of keeping it private or announcing it to the public. However, because the press release was sent directly to the Santa Fe shareholders, Newmont's interest in Santa Fe, and Santa Fe's rejection of Newmont, were both made public. At that time Santa Fe and Homestake had not yet executed a merger agreement.

The next day as word of Newmont's offer spread several lawsuits were filed against the Santa Fe board for allegedly violating its fiduciary duties to the Santa Fe shareholders. The lawsuits alleged that Santa Fe's directors had abused their fiduciary duties by thwarting Newmont's attempts to acquire Santa Fe and by attempting to entrench themselves in their positions.

I.  December 8, 1996, Santa Fe Board Meeting

Over the next week Santa Fe and Homestake continued to work out a merger agreement. On December 8, 1996, the Santa Fe board met again to consider the Santa Fe-Homestake merger. After

discussions the Santa Fe board unanimously approved the proposed agreement. As the basis for this approval the Santa Fe board resolved that an agreement between Santa Fe and Homestake was fair to and in the best interests of Santa Fe and its shareholders. The Homestake board also met that day to discuss and consider the Santa Fe-Homestake proposal. After discussions, the Homestake board decided to enter into the merger transaction with Santa Fe, finding that it was both fair and in the best interests of the corporation and its shareholders.

Santa Fe and Homestake executed a merger agreement which contained a termination fee clause. The clause provided for a payment should the agreement be terminated by either party. The termination fee clause provided in pertinent part that should Santa Fe receive an offer from a third party, and should the Santa Fe-Homestake agreement be breached because of that third party offer, then Santa Fe would be required to pay Homestake $65 million.

Termination fees are included in merger agreements for a variety of reasons, some of which may benefit the target, the acquirer, or both. From the bidder's (Homestake's) perspective, a termination fee could serve a number of purposes, including: (1) To test the seriousness of the potential target; (2) to serve as insurance for the bidder and compensate the bidder for information provided to the target and lost opportunity costs if

its bid is rejected or a rival bidder emerges and wins a contest for the target; and (3) to serve to deter a competing bidder who might not be willing or able to pay the additional expense of the termination fee in order to win the contested merger.  See Swett, "Merger Terminations After Bell Atlantic: Applying A Liquidated Damages Analysis to Termination Fee Provisions", 70 U. Colo. L. Rev. 341, 356 (1999).  A target may benefit by the inclusion of a termination fee because the fee may:  (1) Be necessary to attract a serious bidder by showing the target's willingness to enter into due diligence and negotiations; (2) allow the target's board to preserve its fiduciary duties at a known cost; and (3) protect the target by requiring a reciprocal termination fee in case the acquirer terminates the agreement.  Id. at 356-357.

The Santa Fe-Homestake merger agreement also contained what is known as a fiduciary-out clause.  A fiduciary-out clause is a contract clause that would allow a party to the agreement to consider superior offers if not doing so would cause it to violate its fiduciary duties to its shareholders.

On December 9, 1996, Mr. James held a press conference to announce the Santa Fe-Homestake merger agreement.  The assembled reporters asked Mr. James a number of questions, including some relating to the termination fee and whether the termination fee was included in the merger agreement in order to keep Santa Fe's management and board in place.

In the days after this announcement a number of lawsuits were filed in the State of Delaware, alleging that the Santa Fe board violated its fiduciary duties to Santa Fe's shareholders and that individual board members had abused their positions by accepting the Homestake offer rather than negotiate with Newmont. The suits alleged that the merger agreement with Homestake was entered into in order to entrench Santa Fe's management.

J.   Newmont Reacts to the Santa Fe-Homestake Agreement

On December 18, 1996, Mr. Cambre circulated a memorandum to Newmont's board discussing the prospects of a Newmont-Santa Fe business combination in the light of the Santa Fe-Homestake agreement.  The memorandum provided that Newmont's original valuation of Santa Fe was based upon Newmont's belief that Santa Fe's board and management were in agreement on a merger with Newmont.  The memorandum goes on to note that, instead of supporting a Newmont-Santa Fe merger, Santa Fe was talking to other parties and decided to enter into a transaction with Homestake.

Mr. Cambre also speculated that the Santa Fe board was more inclined to support a merger with Homestake because any combination with Homestake would result in a more favorable treatment of the Santa Fe board and management, rather than a deal with Newmont in which Santa Fe was effectively being acquired.  On the basis of this speculation, Mr. Cambre stated

that the Newmont board should recognize that any action taken by Newmont would probably be opposed by the Santa Fe board because the Santa Fe board would stand to benefit more from a Santa Fe-Homestake merger than a Santa Fe-Newmont combination. Lastly, Mr. Cambre discussed the Santa Fe-Homestake termination fee. Mr. Cambre pointed out that when adding the cost of a proxy fight to the $65 million termination fee, Newmont would be facing an incremental cost of $85 million to "fight and win this battle."

On January 3, 1997, the Newmont board met to discuss the Santa Fe situation. At the meeting, Goldman Sachs presented reports on Newmont's initial offer, the market's reaction to that offer, and Newmont's options going forward, including: (1) Doing nothing; (2) renewing the offer at its current price level; (3) matching Homestake's offer; or (4) making an offer higher than Homestake's. After discussion, the Newmont board resolved to increase Newmont's offer to the Santa Fe shareholders to 0.40 share of Newmont common stock for each share of Santa Fe stock.

Between December 31, 1996, and January 6, 1997, a wholly owned subsidiary of Newmont, Midtown One Corp., privately acquired about 4,800 shares of Santa Fe stock. These acquisitions allowed Newmont to demand a shareholder list from Santa Fe, which was provided to Newmont on January 6, 1997.

On January 7, 1997, Mr. Cambre sent a letter on behalf of the Newmont board to the Santa Fe board. This was the second

"bear hug letter" Newmont had sent Santa Fe and was one of the steps described in the Goldman Sachs presentation as a tool that could be used to "turn up the heat" on Santa Fe. The letter informed the Santa Fe board of Newmont's increased offer and stated that if Santa Fe did not terminate its proposed merger with Homestake, Newmont would solicit proxies against the Homestake merger proposal pursuant to proxy solicitation materials filed with the Securities and Exchange Commission (SEC). Also on January 7, 1997, Newmont filed a registration statement with the SEC along with a preliminary proxy statement and assorted materials attempting to persuade Santa Fe shareholders to vote against the Santa Fe-Homestake merger agreement. In addition, Newmont directly contacted Santa Fe shareholders in an attempt to convince them to vote against the merger agreement.

On January 7, 1997, Homestake was advised of Newmont's increased offer as required by the Homestake-Santa Fe merger agreement. Mr. Thompson responded to this notification by requesting an opportunity to address the Santa Fe board at such time as it would be considering the increased Newmont offer. Mr. Thompson's letter indicated his belief that the Santa Fe-Homestake merger remained superior to the increased Newmont offer and provided greater value to the Santa Fe shareholders; the letter reiterated that the Newmont offer should be rejected.

K.  Santa Fe Reacts to Newmont's Increased Offer

On January 12, 1997, the Santa Fe board met to discuss the increased Newmont offer.  The Santa Fe board heard presentations from Santa Fe's legal and financial advisers and discussed the implications of Newmont's increased offer.  The Santa Fe board then determined that a decision not to investigate the Newmont offer would be a breach of the board's fiduciary duties to Santa Fe's shareholders.  This determination satisfied the fiduciary-out clause, section 4.02(a)(ii)(A), of the Homestake-Santa Fe merger agreement.

Before Santa Fe began considering the Newmont and Homestake offers, the makeup of Santa Fe's investor base began to shift.  Over the preceding year Santa Fe's long-term shareholders and investors had slowly been replaced by larger institutional shareholders and investors.  These new investors brought their own distinct views as to what Santa Fe should do when deciding between the Homestake and Newmont offers.  This change in shareholder makeup was going to have an effect on Santa Fe's decision regarding the two offers.

On January 17, 1997, Mr. Cambre sent a letter to Newmont's board apprising the board of the Santa Fe situation.  Mr. Cambre noted that Newmont was getting good responses from large institutional shareholders who preferred Newmont stock to Homestake.  Mr. Cambre also informed Newmont's board that he had

requested an opportunity to speak with the Santa Fe board during its meetings on January 22 and 23, 1997, when it was anticipated that the Santa Fe board would be considering Newmont's offer.

While the Santa Fe board was considering its next steps, there arose a question of whether the $65 million termination fee would, pursuant to accounting rules, prevent a combination with Newmont from being accounted for as a pooling of interests. Newmont contacted the SEC, hoping to obtain assurances that payment of the termination fee would not prevent a takeover of Santa Fe by Newmont from qualifying for pooling of interests accounting treatment.

On January 23, 1997, the Santa Fe board met. Mr. James and Mr. Batchelder discussed the upcoming negotiations with Newmont, the major questions to ask of Newmont, and a strategy for Santa Fe to follow in investigating the Newmont offer while fulfilling its obligations to Homestake under the merger agreement. Mr. James and Mr. Batchelder hoped to complete their investigation and prepare a comparison of the two options by February 12, 1997, which would then be presented to the full Santa Fe board.

On January 29, 1997, the Newmont board met for a regular meeting and was updated on the attempt to acquire Santa Fe. The Newmont board was also given a presentation by Goldman Sachs which included market reaction to Newmont's offer and a time line of Newmont's next steps. The next day Mr. Cambre sent Mr. James

a letter confirming the teams assigned to various due diligence issues concerning Newmont and Santa Fe before the meeting of the Santa Fe board to consider the Newmont and Homestake offers.

On February 4, 1997, Mr. James wrote to Mr. Thompson. The letter confirmed to Mr. Thompson that Homestake would have an opportunity to present its case to the Santa Fe board in February 1997. The letter also requested that the merger agreement be amended such that any termination fee would not be paid until another business combination had been consummated and that the termination fee would not be paid at all to the extent that it prevented Santa Fe from engaging in a pooling of interests merger. The letter went on to state that the Santa Fe board would consider Homestake's refusal of the above requests as a negative factor when evaluating Homestake's offer. Mr. James sent a similar letter to Mr. Cambre on February 4, 1997, confirming that Newmont would be presenting its offer to the Santa Fe board as well. The letter also requested that Newmont pay the Santa Fe-Homestake termination fee if Santa Fe's board chose Newmont's offer. Newmont refused, as Mr. Cambre viewed the termination fee as Santa Fe's obligation and not Newmont's.

On February 7, 1997, Homestake wrote to Wayne Jarke (Mr. Jarke), Santa Fe's general counsel, requesting that the Santa Fe board reaffirm its recommendation of the Homestake offer in accordance with the Santa Fe-Homestake merger agreement.

On February 13, 1997, Mr. Cambre wrote to the Newmont board to inform the board of the results of Newmont's due diligence. Due diligence was more productive than it had been when performed for the meetings conducted in October and November of 1996 because Santa Fe's management had to engage in legitimate due diligence regarding the pending offers of Homestake and Newmont in order to allow the Santa Fe board members to make an informed decision and satisfy their fiduciary duties. Mr. Cambre described the synergies to be taken advantage of in the event of a combination and discussed the upcoming Santa Fe board meeting.

On February 20, 1997, the Santa Fe board met to consider Homestake's requested reaffirmation as to the Homestake offer. The Santa Fe board decided to reaffirm its commitment to the Homestake offer even though Newmont had increased its offer. Notice that Homestake's offer had been reaffirmed was sent on February 20, 1997.

While preparations for the presentations were ongoing, Santa Fe and Newmont were still facing the prospect that payment of the termination fee to Homestake would prevent Newmont from qualifying for pooling of interests accounting treatment. On or about February 26, 1997, the SEC advised Newmont that payment of the termination fee would not prevent a Santa Fe-Newmont combination from qualifying for pooling of interests accounting treatment.

L.  The March 7-8, 1997, Santa Fe Board Meeting

   1.  Newmont Offer

The Santa Fe board met in Albuquerque, New Mexico, on March 7 and 8, 1997, to discuss the competing business proposals.  The board held four sessions over 2 days.  Newmont made the first presentation.  When it was finished, a Santa Fe director informed Mr. Cambre that the Santa Fe board was going to listen to Homestake's presentation but that during that time Newmont should prepare its best and final offer.  In response to this request, Mr. Cambre made an offer of .43 share of Newmont stock for each share of Santa Fe stock.  The Newmont board held a special meeting to discuss this increased offer and approved the .43-share offer.  Mr. Cambre reported to the Santa Fe board that the Newmont board had approved this higher offer.

   2.  Homestake Offer

      a.  Initial Homestake Offer

Homestake raised its offer before the presentation to the Santa Fe board.  Mr. Thompson informed Mr. James by letter that the Homestake board had approved an increased offer of 1.25 shares of Homestake common stock for each share of Santa Fe common stock.  Newmont's .43-share offer, however, provided a higher value to Santa Fe than Homestake's 1.25-share offer.

b. <u>Attempts To Obtain a Higher Offer</u>

After Newmont increased its offer to .43 share, Santa Fe held out hope that Homestake would be able to raise its offer further. Mr. James visited Mr. Thompson, informed him that Newmont had raised its offer, and asked if Homestake could beat it. Mr. Thompson informed Mr. James that Homestake was unable to raise its offer again. At this point it became clear to Santa Fe that its agreement with Homestake would not prevent Newmont's acquisition. Delaware fiduciary duties laws required Santa Fe's board to obtain the highest value for the company's shareholders.

3. <u>Newmont Wins Out</u>

The Santa Fe board decided that Newmont's offer was superior in value to Homestake's offer. In order to fulfill the fiduciary duties imposed on directors by Delaware State law, the Santa Fe board was required to accept the offer. Accordingly, the Santa Fe board unanimously resolved to accept Newmont's offer.

M. <u>The Santa Fe-Newmont Agreement</u>

On March 10, 1997, the Santa Fe board met again. That same day Mr. James formally notified Homestake that Santa Fe would be terminating the Santa Fe-Homestake agreement and would be paying the termination fee. Santa Fe paid $65 million to Homestake by wire transfer on March 10, 1997. Santa Fe would not receive a refund if the Newmont merger was rejected by its shareholders. Nor would Newmont reimburse Santa Fe for the termination fee if

the combination was rejected.  On March 10, 1997, Mr. Cambre advised the Newmont board by letter that Newmont and Santa Fe had executed a merger agreement.

On April 4, 1997, the Santa Fe shareholders received an invitation to a meeting on May 5, 1997.  At that meeting the Santa Fe shareholders voted to approve the merger with Newmont.

N.  Santa Fe Post Merger

After the Santa Fe-Newmont agreement was executed, Newmont attempted to capitalize on the synergies of the two companies that formed the impetus for Newmont's approaching Santa Fe. Although described by Mr. Cambre as shared synergies between Santa Fe and Newmont, the synergy in reality came from Newmont's ability to mine Santa Fe's land without need of Santa Fe's executives and management.  For the most part synergy was effected by cutting Santa Fe staff, shuttering all Santa Fe offices since they duplicated Newmont offices, and putting any remaining Santa Fe employees under the control of Newmont employees.  Almost all of the employees terminated were employees and managers who came to Newmont from Santa Fe.  All of Santa Fe's board members resigned on or before May 5, 1997.  Santa Fe's headquarters was closed shortly thereafter in August 1997. Newmont also abandoned Santa Fe's 5- and 10-year plans.

On January 15, 1998, Santa Fe timely filed its Form 1120, U.S. Corporation Income Tax Return, for the short period January

1 to May 5, 1997. Santa Fe claimed a deduction of $68,660,812, of which $65 million was the termination fee paid pursuant to the merger agreement between Santa Fe and Homestake.

On August 15, 2005, respondent issued to Newmont USA Limited (petitioner), as Santa Fe's successor in interest, a statutory notice of deficiency which determined in relevant part that petitioner was not entitled to a deduction for the termination fee. The notice stated in pertinent part:

7.a.3 Abandonments (Termination Fee)

It is determined that are allowed $-0- as a deduction for abandonments under section 165 of the Internal Revenue Code rather than the $65,000,000 shown on your return for the tax year ended May 5, 1997. The amount of $65,000,000 is not allowed as a deduction because it was a capital expenditure under section 263 of the Internal Revenue Code. Therefore, your taxable income for the tax year ended May 5, 1997 is increased $65,000,000.

On November 9, 2006, petitioner filed a petition with this Court, alleging in part that respondent erred in disallowing the claimed deduction for $65 million. A trial was held from December 10 to 14, 2007, during a special session of the Court in Atlanta, Georgia. Petitioner presented a number of fact witnesses, and both petitioner and respondent presented expert testimony. Petitioner argues that Santa Fe is entitled to deduct the $65 million paid to Homestake. Respondent argues that Santa Fe is required to capitalize the $65 million.

OPINION

I.  Burden of Proof

We must decide whether Santa Fe may deduct the termination fee or must capitalize it as an expenditure to be deducted in later years.  The Commissioner's determinations in the notice of deficiency are presumed correct, and the taxpayer bears the burden of proving,[6] by a preponderance of the evidence, that these determinations are incorrect.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).

II.  Deductibility vs. Capitalization

For Federal income tax purposes the principal difference between classifying a payment as a deductible expense or a capital expenditure concerns the timing of the taxpayer's recovery of the cost.  As the Supreme Court observed in INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 83-84 (1992):

> The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery: While business expenses are currently deductible, a capital expenditure usually is amortized and depreciated over the life of the relevant asset, or where no specific asset or useful life can be ascertained, is deducted upon dissolution of the

---

[6]Petitioner argues that respondent should bear the burden of proving that the termination fee should be capitalized because the notice of deficiency did not adequately describe the basis for disallowance under Shea v. Commissioner, 112 T.C. 183 (1999). We decline to address petitioner's argument.  Petitioner presented its case as if it bore the burden of proof, and the record supports our decision regardless of whether the burden is on petitioner or respondent.

enterprise. * * * Through provisions such as these, the Code endeavors to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes. * * *

Section 162(a) allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". To qualify for a deduction, "an item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 352 (1971). Section 165(a) allows as a deduction "any loss sustained during the taxable year and not compensated for by insurance or otherwise."

An expense may be ordinary even if it rarely occurs or occurs only once within the lifetime of the taxpayer. Welch v. Helvering, supra at 114. Although the transaction may be unique to the individual taxpayer, the question is whether the transaction is ordinary in the "life of the group, the community, of which * * * [the taxpayer] is a part." Id. An expense is necessary if it meets "the minimal requirement that the expense be 'appropriate and helpful' for 'the development of the [taxpayer's] business.'" Commissioner v. Tellier, 383 U.S. 687, 689 (1966) (quoting Welch v. Helvering, supra at 113). A deduction is generally allowed for expenses incurred in defending

a business and its policies from attack.  INDOPCO, Inc. v. Commissioner, supra at 83; Commissioner v. Tellier, supra; Commissioner v. Heininger, 320 U.S. 467 (1943); see also Locke Manufacturing Cos. v. United States, 237 F. Supp. 80 (D. Conn. 1964) (permitting corporation to deduct expenses incurred in successful defense to proxy fight).  The underlying reasoning in this line of cases is that the expenses were incurred to protect corporate policy and structure, not to acquire a new asset.  See, e.g., United States v. Federated Dept. Stores, Inc., 171 Bankr. 603, 610 (S.D. Ohio 1994), affg. In re Federated Dept. Stores, Inc., 135 Bankr. 950 (Bankr. S.D. Ohio 1992).

Section 263(a)(1) generally provides that a deduction is not allowed for "Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate."

The determination of whether an expenditure is deductible under section 162(a) or must be capitalized under section 263(a)(1) is a factual determination.  When an expense creates a separate and distinct asset, it usually must be capitalized. See, e.g., Commissioner v. Lincoln Sav. & Loan Association, supra.  When an expense does not create such an asset, the most critical factors to consider in passing on the question of deductibility are the period over which the taxpayer will derive a benefit from the expense and the significance of that benefit.

See INDOPCO, Inc. v. Commissioner, supra at 87-88; United States v. Miss. Chem. Corp., 405 U.S. 298, 310 (1972); FMR Corp. & Subs. v. Commissioner, 110 T.C. 402, 417 (1998); Conn. Mut. Life Ins. Co. v. Commissioner, 106 T.C. 445, 453 (1996). Expenses must generally be capitalized when they either: (1) Create or enhance a separate and distinct asset, or (2) otherwise generate significant benefits for the taxpayer extending beyond the end of the taxable year. Metrocorp, Inc. v. Commissioner, 116 T.C. 211, 222 (2001). Under the required test, capitalization is not always required when an incidental future benefit is generated by an expense. INDOPCO, Inc. v. Commissioner, supra at 87. "Whether a benefit is significant to the taxpayer who incurs the underlying expense rests on the duration and extent of the benefit, and a future benefit that flows incidentally from an expense may not be significant." Metrocorp, Inc. v. Commissioner, supra at 222.

A. INDOPCO, Inc. v. Commissioner

The Supreme Court considered fees incurred during a friendly business combination in INDOPCO, Inc. v. Commissioner, supra. The focus of the Supreme Court's opinion was the taxpayer's argument that the fees at issue were deductible because no separate and distinct asset was created. The taxpayer attempted to argue that under the Court's opinion in Commissioner v. Lincoln Sav. & Loan Association, supra, only fees that led to the

creation of a separate and distinct asset were subject to capitalization.  The Court rejected the taxpayer's argument. INDOPCO, Inc. v. Commissioner, supra at 86-87.  The Court held that the fees at issue were to be capitalized because they provided for benefits extending past the tax year at issue.

   B.   Victory Mkts., Inc. & Subs. v. Commissioner

   In Victory Mkts., Inc. & Subs. v. Commissioner, 99 T.C. 648 (1992), we were confronted with facts similar to those of INDOPCO, Inc. v. Commissioner, supra.  The taxpayer argued that it incurred professional service fees in connection with the acquisition of its stock by an acquirer and claimed that it was entitled to deduct those expenses because, unlike the taxpayers in INDOPCO, Inc., it was acquired in a hostile takeover.  We declined to decide whether INDOPCO, Inc., required capitalization of expenses incurred incident to a hostile takeover, however, because we concluded that the nature of the takeover in Victory Mkts. was not hostile and that the facts were generally indistinguishable from those in INDOPCO, Inc.

   C.   United States v. Federated Dept. Stores, Inc.

   United States v. Federated Dept. Stores, Inc., supra, addressed breakup fees paid to "white knights" in the aftermath of failed merger attempts undertaken to avoid undesired corporate takeovers.  The District Court sustained the bankruptcy court's holdings that deductions were allowable under either section 162

or section 165.  The District Court relied on the bankruptcy court's findings that no benefit accrued beyond the year in which the expenditures were made and, on that basis, distinguished INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992).  The bankruptcy judge had found explicitly that the provisions for the payment of the breakup fees did not enhance the amounts that the debtors' shareholders actually received in the takeover transactions.  The District Court also agreed with the bankruptcy court that the failed merger transactions with white knights were separate transactions from the successful takeovers and thus could be treated as abandoned transactions eligible for a loss deduction under section 165.

D.   Staley I & II

In A.E. Staley Manufacturing Co. & Subs. v. Commissioner, 105 T.C. 166 (1995) (Staley I), revd. 119 F.3d 482 (7th Cir. 1997) (Staley II), we were again faced with a situation similar to that of INDOPCO, Inc. and Victory Mkts.  In Staley I, we were asked to consider the proper characterization of fees paid by a corporation to investment bankers shortly before the corporation was acquired.  We held that the fees be capitalized rather than deducted under section 162 or 165.  We disallowed the deductions on the basis of the Supreme Court's opinion in INDOPCO, Inc.  We also held that the taxpayer was not allowed to deduct the costs as an abandonment loss.  We distinguished the situation in Staley

I from that of <u>Federated Dept. Stores</u> because unlike the situation in <u>Federated Dept. Stores</u>, there was no white knight transaction present in Staley I.

The U.S. Court of Appeals for the Seventh Circuit reversed. The Court of Appeals discussed the law concerning the deductibility of expenses to resist changes in corporate control before <u>INDOPCO, Inc.</u>, then stated that <u>INDOPCO, Inc.</u> neither abrogated nor even discussed those cases. The Court of Appeals then stated that the issue for decision in determining the deductibility of the fees was "whether the costs incurred * * * are more properly viewed as costs associated with defending a business or as costs associated with facilitating a capital transaction." Staley II, 119 F.3d at 489. The court allowed a deduction in part, remanding to this Court to allocate the costs between those that were incurred to prevent the takeover and those that facilitated the takeover.

III. <u>Origin of the Claim Doctrine</u>

The issue of whether expenses are deductible or must be capitalized may be resolved by the origin of the claim test. <u>Woodward v. Commissioner</u>, 397 U.S. 572 (1970); <u>United States v. Gilmore</u>, 372 U.S. 39 (1963). Under this test, the substance of the underlying claim or transaction out of which the expenditure in controversy arose governs whether the item is a deductible expense or a capital expenditure, regardless of the motives of

the payor or the consequences that may result from the failure to defeat the claim. See Woodward v. Commissioner, supra at 578; Newark Morning Ledger Co. v. United States, 539 F.2d 929, 935 (3d Cir. 1976); Clark Oil & Ref. Corp. v. United States, 473 F.2d 1217, 1220 (7th Cir. 1973); Anchor Coupling Co. v. United States, 427 F.2d 429, 433 (7th Cir. 1970). The origin of the claim test does not involve a "mechanical search for the first in the chain of events" but requires consideration of the issues involved, the nature and objectives of the litigation, the defenses asserted, the purpose for which the amounts claimed as deductions were expended, and all other facts relating to the litigation. Boagni v. Commissioner, 59 T.C. 708, 713 (1973). The Supreme Court, in adopting the origin of the claim test, chose in favor of

> the view that the origin and character of the claim
> with respect to which an expense was incurred, rather
> than its potential consequences upon the fortunes of
> the taxpayer, is the controlling basic test of whether
> the expense was "business" or "personal" and hence
> whether it is deductible or not under § 23(a)(2). * * *

United States v. Gilmore, supra at 49.

The origin of the claim doctrine can help determine whether the termination fee should be deducted or capitalized by determining whether it is more closely tied to the Santa Fe-Homestake deal or the Santa Fe-Newmont deal.

IV.  Petitioner's Arguments

   A.  Significant Benefit

Petitioner argues that Santa Fe did not receive a significant benefit from payment of the termination fee.  First, petitioner argues that payment of the fee reduced Santa Fe's net worth by $65 million.  Second, petitioner focuses on the effects of the Santa Fe-Newmont merger on Santa Fe.  Petitioner points to the removal of Santa Fe's management team, the removal of Santa Fe's board of directors, the abandonment of Santa Fe's 5- and 10-year plans, and the termination of more than half of Santa Fe's employees.  Lastly, petitioner argues that Newmont closed a disproportionate number of Santa Fe facilities after the merger was consummated.

   B.  Origin of the Claim

Petitioner argues that the origin of the claim doctrine requires us to find that the origin of the termination fee lies with the Santa Fe-Homestake agreement, and not the Santa Fe-Newmont combination.  Petitioner points to the fee's origin in the Santa Fe-Homestake agreement and to the fact that the Santa Fe-Newmont agreement also included its own separate termination fee.  Petitioner also points to the fact that the obligation to pay the termination fee arose before Santa Fe's later agreement with Newmont.

Petitioner attempts to rely on 12701 Shaker Blvd Co. v. Commissioner, 36 T.C. 255 (1961), affd. 312 F.2d 749 (6th Cir. 1963), in support of its argument. In that case the Court determined the deductibility of fees paid by a corporation to retire bonds before issuing new bonds. In rejecting the taxpayer's argument that the fee should be tied to the new bond issue, we stated that the new financing was not so closely tied to the paying off of the old indebtedness that the two transactions cannot properly be deemed as separate and independent transactions. Id. at 258. Petitioner analogizes the issue in Shaker Blvd. Co. to the present issue.

Petitioner next contends that under Wells Fargo Co. & Subs. v. Commissioner, 224 F.3d 874 (8th Cir. 2000), affg. in part and revg. in part Norwest Corp. & Subs. v. Commissioner, 112 T.C. 89 (1999), the termination fee is more directly related to the Santa Fe-Homestake agreement than the Santa Fe-Newmont agreement. Therefore, because the fee is only indirectly related to the Santa Fe-Newmont deal, capitalization is not required under the origin of the claim doctrine and the termination fee is deductible.

Petitioner further argues that a finding that Newmont acted in a hostile manner supports its position. Petitioner points to language in Staley II and United States v. Federated Dept. Stores, Inc., 171 Bankr. 603 (S.D. Ohio 1994), where the courts

stated that costs incurred to defend a business from attack are deductible. Petitioner contends that these cases, along with respondent's concession that costs incurred to defend a business are deductible, resolve the instant proceeding in favor of deductibility.

Lastly, petitioner argues that the termination fee should be deducted because it served to frustrate, rather than facilitate, the merger between Santa Fe and Newmont. In petitioner's view, this finding--that the fee frustrated Newmont's attempts--brings the facts of the present case out of the INDOPCO, Inc. line of cases and into the Staley II and Federated Dept. Store cases.

C. Petitioner's Experts

Petitioner put forth two experts. Petitioner's first expert, W. Eugene Seago (Mr. Seago), has worked in the accounting field for more than 30 years and is a professor of accounting at Virginia Polytechnic Institute and State University. Mr. Seago's expert report focused on the termination fee as it related to public accounting principles, including whether inclusion of the fee in Santa Fe's income would fairly represent Santa Fe's income for 1997.

Petitioner's second expert, Gilbert E. Matthews (Mr. Matthews), has more than 45 years of experience in investment banking. Mr. Matthews's report made the following conclusions: (1) That the termination fee frustrated Newmont's attempts to

acquire Santa Fe; (2) that Newmont, although first acting friendly, was clearly attempting a hostile takeover; (3) that Santa Fe as an entity did not benefit from the Newmont takeover; and (4) that although short-term shareholders benefited from Newmont's takeover, that benefit did not last for more than a year (i.e., the takeover did not benefit long-term holders of Santa Fe stock).

V.   Respondent's Arguments

   A.  Significant Benefit

It is respondent's position that the termination fee should be capitalized under section 263(a) and not deducted under section 162(a).  Respondent argues that petitioner paid the termination fee in order to enter into the Newmont offer. Respondent argues that Santa Fe was not facing a hostile takeover but instead wanted to overhaul its capital structure.  Respondent further argues that Santa Fe's entering into an agreement with Homestake was merely a negotiating tactic aimed at convincing Newmont to increase its offer.  Respondent points to Santa Fe's contacting Newmont in September 1996 as the beginning of Santa Fe's search for a business combination.  Respondent's expert argues that at that time Santa Fe was "in play" and any action taken afterwards was done to secure the highest possible value for Santa Fe's shareholders.

As evidence of this significant benefit, respondent points to the March 28, 1996, report prepared by S.G. Warburg that advised Santa Fe that Santa Fe would not become a first-tier gold company without "strategic acquisitions, mergers or alliances." Respondent also points to the Santa Fe board's decision of September 26, 1996, to investigate a possible merger with Newmont. In respondent's view this statement is indicative of a decision by Santa Fe to proceed with a merger or sale of the company. Respondent also points to statements by the Santa Fe board contained in the March 10, 1997, board minutes and in the April 4, 1997, SEC Form S-4, Joint Proxy Statement. Both documents indicated that the Santa Fe board viewed the merger with Newmont as fair and in the best interests of Santa Fe stockholders:

> In the Form S-4, the board of directors indicates that it unanimously concluded that the merger is fair and in the best interests of the Santa Fe shareholders, and accordingly, unanimously approved the merger agreement and unanimously resolve to recommend that the Santa Fe shareholders approve and adopt the merger agreement.

Respondent also points to press releases issued by Santa Fe and Newmont at the time of the merger generally touting the perceived benefits of the merger.

In respondent's view the termination fee was paid in order to enter into an agreement with Newmont and thus led to any benefits gained by entering into the agreement with Newmont.

Therefore, the presence of these benefits requires that the termination fee be capitalized under section 263.

B. Origin of the Claim

Respondent argues that the origin of the claim doctrine requires the capitalization of the termination fee. Respondent argues that Santa Fe's payment of the termination fee was directly related to the merger with Newmont. Respondent maintains that Santa Fe was actively seeking a business merger.

Respondent points to Acer Realty Co. v. Commissioner, 132 F.2d 512, 513 (8th Cir. 1942), affg. 45 B.T.A. 333 (1941), and similar cases. In Acer Realty Co., the Court of Appeals had to determine the deductibility of large salary payments related to a capital transaction. The court found that because the large salaries were directly related to a capital transaction, the salaries were required to be capitalized as part of that transaction. In Wells Fargo Co. & Subs. v. Commissioner, 224 F.3d 874 (8th Cir. 2000), however, the Court of Appeals found that salaries paid to employees who worked on a restructuring of the corporation were deductible because they were not extraordinary like the salaries in Acer Realty Co. Respondent distinguishes Wells Fargo on the grounds that while the salaries in Wells Fargo would have been paid whether the subject transactions were entered into or not, the termination fee at issue in the instant case would not have been paid unless Santa

Fe entered into a transaction with Newmont. Respondent points to the fact that payment of the termination fee was conditioned on a "Company Takeover Proposal" and argues that this proposal is extraordinary and thus like the salaries in Acer Realty Co.

Respondent also argues that petitioner's application of the origin of the claim doctrine is improper because petitioner is simply applying the doctrine in a mechanical way according to which agreement was entered into first. Respondent argues that we have previously rejected this application of the doctrine in Boagni v. Commissioner, 59 T.C. at 713. Respondent argues that the Santa Fe-Newmont agreement triggered the termination fee and that the termination fee was paid so Santa Fe could enter into an agreement with Newmont. Therefore, the termination fee was directly associated with and facilitated the merger, unlike the salary expenses in Wells Fargo.

Respondent also disputes petitioner's claimed reliance on Staley II and United States v. Federated Dept. Stores, Inc., 171 Bankr. 603 (S.D. Ohio 1994). Regarding Staley II, respondent frames the issue in the present case as whether the termination fee facilitated the merger that took place and argues that Staley II in fact requires capitalization of the termination fee. Respondent argues that Santa Fe faced one decision in March 1997: to proceed with Homestake and not pay a fee or proceed with Newmont and pay a fee. Under respondent's view, Santa Fe's

decision to proceed with Newmont means that the termination fee became a cost to Santa Fe of fulfilling its overall objective of combining with another large mining company. Therefore, the termination fee "facilitated" the Santa Fe-Newmont merger and should be capitalized.

Respondent argues that Federated Dept. Stores is distinguishable. In Federated Dept. Stores, the District Court based its holding on the fact that "the subject hostile takeovers could not, and did not provide Federated or Allied with the type of synergy found in INDOPCO." United States v. Federated Dept. Stores, Inc., supra at 609. Respondent argues that in the present case, the synergies found in INDOPCO, Inc. are present; therefore, Federated Dept. Stores does not apply. Respondent also argues that Federated Dept. Stores is distinguishable because there the targets engaged in defensive tactics that respondent argues are not present here. The District Court stated that "The bankruptcy court specifically found that the '[d]ebtors engaged in protracted and strenuous defensive tactics when faced, involuntarily, with the threat of Campeau's hostile acquisition.'" United States v. Federated Dept. Stores, Inc., supra at 610 (quoting In re Federated Dept. Stores, 135 Bankr. at 961). Respondent argues that Santa Fe did not engage in any hostile defenses, even though there were a number of possible

defensive tactics at its disposal (such as poison pills or shareholder rights plans).

### C. Respondent's Expert

Respondent produced one expert witness, William H. Purcell (Mr. Purcell), a senior director at a Washington, D.C. investment banking firm. Mr. Purcell has over 40 years of experience in the investment banking business.

Mr. Purcell made a number of findings in support of respondent's arguments, including: (1) That the Santa Fe-Newmont transaction was not hostile; (2) that Santa Fe put itself into play as of October 1, 1996; and (3) that Santa Fe used the termination fee as a tool to maximize value for Santa Fe's shareholders. In Mr. Purcell's view, Santa Fe entered into an agreement with Homestake because Santa Fe wanted to send a message to Newmont that Newmont would have to raise its bid in order to acquire Santa Fe.

## VI. Analysis

As discussed above, we must determine whether payment of the termination fee "[generated] significant benefits for * * * [Santa Fe] extending beyond the end of the taxable year." Metrocorp. Inc. v. Commissioner, 116 T.C. at 222. As we stated in Metrocorp: "Expenses must generally be capitalized when they either: (1) Create or enhance a separate and distinct asset or (2) otherwise generate significant benefits for the taxpayer

extending beyond the end of the taxable year." Id. at 221-222. However, we must take care not to interpret every benefit received after payment of the termination fee as being caused by or related to the termination fee.

We note at the outset that this was clearly a hostile takeover of Santa Fe by Newmont. The management, board of directors, and investment bankers of Santa Fe considered Newmont hostile. Although initial contacts between the two entities were informal, Newmont went directly to Santa Fe's shareholders once it learned that Santa Fe and Homestake had entered into an agreement. The presentations Goldman Sachs made to Newmont executives clearly foresaw a hostile takeover. Mr. Cambre's letters to the Newmont board anticipated a fight and warned the board that this would lead to higher costs.

Executives of Santa Fe, Newmont, and Homestake all testified credibly that this was a hostile takeover. Further, we find credible petitioner's expert Mr. Matthews's conclusion that this was a hostile takeover. Respondent's expert's contention that this was a friendly transaction is at odds with the record as a whole and is not credible.

Although the merger was described in terms of "shared synergies", the only synergy found in the transaction benefited Newmont. By acquiring Santa Fe, Newmont was able to obtain Santa Fe's land while disregarding most of Santa Fe's annual expenses.

The record makes clear that Newmont was primarily interested in obtaining Santa Fe's land position, and the only way for Newmont to acquire Santa Fe's land was to purchase the entire company. Because Newmont was primarily interested in Santa Fe's land, it quickly terminated Santa Fe's employees and discarded the business plans of Santa Fe's management. Although Santa Fe the entity continued to exist on paper, it was nothing more than a shell owning valuable land.

Santa Fe did not reap the types of benefits present in INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992). After the merger was completed, Newmont shut down Santa Fe's headquarters and let go most of its management. The Supreme Court's decision in INDOPCO, Inc. to require capitalization of the fees at issue therein relied on findings of this Court and the Court of Appeals for the Second Circuit that the expenditures at issue benefited the operations of the taxpayer incurring the fees. Santa Fe's operations did not benefit from payment of the termination fee.

Santa Fe's executives testified credibly that Santa Fe did not have as a strategic goal a business merger with any other mining company. Newmont was a hostile acquirer. In attempting to avoid Newmont's overtures, Santa Fe sought a white knight: Homestake. Santa Fe was defending against an unwanted acquisition in an effort to maintain and protect its growing business. The termination fee was contracted for in an attempt

to salvage its business plan and employees through a white knight combination.  See United States v. Federated Dept. Stores, Inc., 171 Bankr. at 610.

The termination fee was intended to protect the Santa Fe-Homestake agreement, to deter competing bids, and to reimburse Homestake for its time and effort in the event that the deal was terminated.  Although Santa Fe had structural defenses in place, its major defensive strategy was to engage in a capital transaction with a third party that would prevent Newmont's acquisition.  This attempt failed.  The record does not support a finding, and we do not find, that paying the termination fee produced any long-term benefit.  See id.  Respondent argues that Federated Dept. Stores is distinguishable on the facts because Santa Fe allegedly did not engage in defensive measures; however, the District Court in Federated Dept. Stores stated that the targets "engaged in defensive measures--the white knight proposals with DeBartolo and Macy respectively."  Id.  The white knight transactions in Federated Dept. Stores were in fact viewed by the court as defensive measures meant to prevent the respective takeovers.  The Santa Fe-Homestake agreement was a defensive measure meant to prevent Newmont's takeover of Santa Fe.  The termination fee was a part of the Santa Fe-Homestake agreement and served as a defense against Newmont.  Any benefit as a result of incurring the termination fee died along with the

Santa Fe-Homestake agreement. Had Santa Fe's shareholders rejected the Santa Fe-Newmont agreement, or had some exigent circumstance arisen that required termination of the Santa Fe-Newmont agreement, Santa Fe would not have recovered the $65 million.

Although the fact that National Starch became a subsidiary as a result of its merger was viewed as a benefit supporting capitalization in INDOPCO, Inc., we do not find Santa Fe's becoming a subsidiary to be a significant benefit. In INDOPCO, Inc., National Starch's management viewed becoming a subsidiary as a positive aspect of the acquisition because it relieved National Starch of its shareholder responsibilities. The Supreme Court relied on this change of ownership in support of its decision to require capitalization precisely because the change in ownership structure served to benefit National Starch's operations. In the instant case, Santa Fe did not become a subsidiary which functioned much as Santa Fe had before the merger. Santa Fe no longer functioned as an autonomous business after the merger. Santa Fe viewed Homestake as a potential white knight to avoid just this result. Santa Fe management sought an agreement with Homestake to avoid being absorbed by Newmont, but the results of the Newmont merger confirm the accuracy of their concerns that Santa Fe would lose its operating identity in a merger with Newmont.

As stated above, the record does not support a finding that Santa Fe had as an overarching goal a business combination. The fact that the Santa Fe board had hired investment advisers and knew the state of the industry before initiating contact with Newmont does not mean that Santa Fe had decided on a corporate restructuring. Santa Fe executives testified credibly that Santa Fe's first contact with Newmont was meant to be preventative and meant to enable Santa Fe to remain in control of any investigation and agreement. The Santa Fe-Newmont agreement was not a modified form of the Santa Fe-Homestake agreement. Payment of the termination fee and subsequent signing of the Santa Fe-Newmont agreement was not, in substance, a continuation of the Santa Fe-Homestake agreement in some modified form. The two transactions were separate: (1) A white knight transaction; and (2) a hostile takeover. See United States v. Federated Dept. Stores Inc., supra at 611.

Santa Fe viewed Newmont's overtures as hostile; and in an attempt to defeat Newmont's takeover, Santa Fe sought out Homestake as a white knight. Because Newmont's offer was higher than Homestake's, the Santa Fe board believed that in order to fulfill its fiduciary duties the board had to terminate its agreement with Homestake and accept Newmont's higher offer. The facts do not support respondent's contention that the termination fee was paid to restructure Santa Fe in hopes of some future

benefit. See id. The termination fee was paid to Homestake to compensate it for whatever expenses it incurred. See id. As the District Court concluded in Federated Department Stores: "in the instant case, the white knight mergers were abandoned. Any effect that this merger had on the later merger with Campeau is irrelevant." Id. at 611-612.

This Court's holdings in Staley I and Norwest Corp. & Subs. v. Commissioner, 112 T.C. 89 (1999), are distinguishable.

In Norwest Corp. & Subs. v. Commissioner, supra at 102, we required the taxpayer to capitalize salaries paid to bank executives for work performed in relation to a friendly merger that provided the bank with significant long-term benefits. Because of a change in State banking law, the taxpayer, a small local bank, sought out a merger with a larger national bank. The taxpayer merged with Norwest because doing so would allow the bank to continue operating competitively. After the transaction, the bank remained in operation and offered a wider array of services than the bank had offered previously. Id. at 95.

Relying on INDOPCO, Inc., we required capitalization because the disputed expenses "enabled * * * [the taxpayer] to achieve the long-term benefit that it desired from the transaction". Norwest Corp. & Subs. v. Commissioner, supra at 100. Although the expenses were not directly related to the benefit, we

required capitalization because "the costs were essential to the achievement of that benefit." Id. at 102.

In Staley I, as discussed above, we required the taxpayer to capitalize fees paid to investment bankers incident to a takeover. The taxpayer was a producer of food sweeteners and faced a takeover. The taxpayer hired and paid advisers who counseled the taxpayer before the takeover. Ultimately, the board of the taxpayer decided to accept the acquirer's offer. We held that the expenses had to be capitalized because they were incurred incident to the taxpayer's change of ownership, from which it derived significant long-term benefits.

Unlike Staley I, the present case features a white knight-- Homestake. Further, the acquirer in Staley I had long-term plans for the target corporation. Although the acquirer's plans diverged from those of the target's management, they were plans that nonetheless involved the target's operation as an ongoing company. After the takeover, the taxpayer existed and operated as a business. In the present case, Newmont did not have any plans for Santa Fe's continued operation, and Santa Fe did not operate post takeover.

In contrast to Norwest Corp. & Subs., the instant transaction was not friendly. Newmont proceeded in a hostile manner once its initial contacts were rebuffed. Newmont's board and management planned for and effected a hostile takeover.

Secondly, Santa Fe did not reap the type of benefits present in Norwest Corp. & Subs. Santa Fe was not able to operate in an improved manner once the transaction was completed. Santa Fe did not have access to wider services as a result of the merger, and Santa Fe was not able to operate competitively once taken over. Santa Fe, unlike the taxpayer in Norwest Corp. & Subs., effectively ceased to exist.

Both Norwest Corp. & Subs. and Staley I focused on corporations whose operations benefited from the respective payments at issue. In the present case, Santa Fe's operations did not improve as a result of payment of the termination fee. As a result of the combination Santa Fe ceased operation. Although the merger was described in terms of synergies between the two companies, the result of the transaction was that Newmont was able to mine Santa Fe's land while cutting any duplicate costs. In INDOPCO, Inc. the taxpayer's operations improved because it gained access to National Starch's large distribution network. In Norwest Corp. & Subs., the taxpayer benefited because it was both able to remain in competition in a much more competitive market and able to offer a wider range of services than it had before. In Staley I, the taxpayer benefited because as a result of its combination it moved away from recent strategic expansions into new industries back to its core business lines.

Payment of the termination fee did not lead to significant benefits for Santa Fe extending past the year at issue. Accordingly, petitioner is entitled to deduct the amount of the termination fee pursuant to section 162. In the light of our reasoning as stated above, we do not reach petitioner's argument concerning the origin of the claim doctrine.

VII. Conclusion

On the basis of the foregoing, petitioner is entitled to deduct the termination fee pursuant to section 162.

VIII. Section 165

Section 165 allows current deductions of any "loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165 allows a current deduction for costs associated with an abandoned capital transaction. Sibley, Lindsay & Curr Co. v. Commissioner, 15 T.C. 106 (1950). These principles have been applied even though the abandoned transaction, if consummated, would be a capital transaction and the associated costs would have to be capitalized. See Doernbecher Manufacturing Co. v. Commissioner, 30 B.T.A. 973 (1934), affd. on other grounds 80 F.2d 573 (9th Cir. 1935). The question is whether the subject transaction was actually abandoned. United States v. Federated Dept. Stores, Inc., 171 Bankr. at 611. The loss must be evidenced by a closed and completed transaction, fixed by identifiable events. Sec. 1.165-

1(b), (d), Income Tax Regs. The regulations also provide that the loss must be bona fide and that substance, not mere form, shall govern in determining a deductible loss. Sec. 1.165-1(b), Income Tax Regs. In <u>Sibley, Lindsay & Curr Co. v. Commissioner</u>, <u>supra</u>, the taxpayer's bankers prepared three separate restructuring plans. The taxpayers chose one of the three and attempted to deduct the cost of the other two. This Court allowed a deduction for the cost of the other two restructuring plans because they were separate plans distinct from the restructuring that was carried out. <u>Id.</u> at 110.

The District Court in <u>United States v. Federated Dept. Stores, Inc.</u>, 171 Bankr. 603 (S.D. Ohio 1994), also found that the taxpayers were entitled to deduct the termination fees pursuant to section 165. The District Court stated that both targets were presented with two mutually exclusive capital transactions: Mergers with the white knights, or mergers with the hostile acquirer. <u>Id.</u> at 611. The District Court reasoned that each transaction "must be viewed separately" and went on to state that "Just because a failed capital transaction has some effect on a later successful capital transaction does not prevent a deduction for a loss sustained in the failed transaction." <u>Id.</u>

Respondent argues that petitioner is not entitled to claim a deduction for an abandonment loss. As stated above, respondent argues that beginning in October 1996 Santa Fe had as a goal a

corporate restructuring.  Respondent views the potential Newmont and Homestake deals as two mutually exclusive alternatives, each a part of this goal.  Because Santa Fe could merge with only one, and because Santa Fe had to terminate the Santa Fe-Homestake agreement to merge with Newmont, the termination fee should not be allowed as a deduction under section 165 because Santa Fe never abandoned its goal of a combination and in fact satisfied it by merging with Newmont.  Respondent argues Santa Fe's goal was a business merger, not that the Homestake and Newmont mergers were two separate transactions.  Therefore, because (1) Santa Fe combined with Newmont, (2) the termination fee was paid to facilitate that merger, and (3) because no transaction was abandoned, there was no closed transaction with Homestake.

Respondent argues that caselaw requires the capitalization of fees paid to extricate a party from one contract in order to enter into a more favorable contract as part of an integrated plan or overall objective.  Respondent points to a line of cases where costs related to mutually exclusive alternatives that were part of an integrated plan were not allowed as abandonment losses.  Respondent further argues that Santa Fe made a voluntary and well-thought-out decision to terminate the Homestake agreement, pay the termination fee, and merge with Newmont.

Petitioner argues that Santa Fe was faced with two separate transactions:  (1) A hostile takeover by Newmont; and (2) a white

knight transaction with Homestake. Santa Fe management, in petitioner's view, was not engaged in one overarching plan to restructure the company's capital structure. Santa Fe attempted to avoid Newmont's overtures by entering into a deal with Homestake. When Newmont increased its offer, the Santa Fe board had no choice but to abandon the Homestake deal. Therefore, petitioner argues, the termination fee paid to Homestake was part of an abandoned transaction and petitioner is allowed to deduct the termination fee under section 165.

Petitioner again analogizes the current case to Federated Dept. Stores. Respondent argues that Federated Dept. Stores does not apply and argues that the key fact underlying the Federated Dept. Stores decision--that neither of the targets in that case had voluntarily terminated their merger agreements in order to engage in a more favorable merger--is not present here.

We agree with petitioner. The facts in this case do not show that Santa Fe pursued a corporate restructuring. It is clear that the board and management of Santa Fe did not want to be taken over by a large competitor so shortly after the company was spun off from its former parent. Santa Fe viewed Newmont as hostile and entered into a white knight agreement with Homestake in order to prevent Newmont's acquisition. Later, Santa Fe was forced to abandon its agreement with Homestake when it became clear that Newmont's offer had to be accepted. When Newmont

raised its bid above that of Homestake and Homestake refused to match it, Santa Fe had no choice. Delaware law required that the board members choose the highest value for their shareholders. This forced Santa Fe to breach the Santa Fe-Homestake agreement and pay the termination fee. At that time, the Santa Fe-Homestake merger was abandoned. The termination fee was paid as a result of that abandonment and was therefore a cost of the abandoned merger with Homestake.

Accordingly, Santa Fe is alternatively entitled to a deduction under section 165. Santa Fe viewed the possible transactions with Homestake and Newmont as separate and distinct. The two possible combinations were not part of an overall plan by Santa Fe to change its capital structure. The Santa Fe-Homestake agreement was a closed and completed transaction that Santa Fe later abandoned when it entered into the Santa Fe-Newmont agreement.

IX. Conclusion

On the basis of the foregoing, petitioner is entitled to a deduction of $65 million pursuant to sections 162 and 165 for the termination fee paid to Homestake.

Accordingly,

Decision will be entered under Rule 155.